UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARDMORE CONSULTING GROUP,
INC.,

      **Plaintiff,**

         v.

MARIA CONTRERAS-SWEET, in her
official capacity as Administrator, U.S.
Small Business Administration,

      **Defendant.**

Civil Action No. 14-832 (JDB)

## MEMORANDUM OPINION

Ardmore Consulting Group, a firm wholly owned by Vineeta Prabhu, applied for admission into the Small Business Act's 8(a) Program, which provides certain competitive benefits to participants. After considering (and then reconsidering) Ardmore's application, the Small Business Administration concluded that the firm was ineligible for the program. Ardmore then brought this action under the Administrative Procedure Act to challenge the SBA's conclusion, and the parties' cross-motions for summary judgment are now before the Court. For the reasons explained below, the Court will grant summary judgment in favor of the SBA.

## BACKGROUND

To be eligible for the 8(a) Program, a small business must meet two general requirements. First, the firm must be "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." 13 C.F.R. § 124.101. And second, it must "demonstrate[] [its] potential for success." Id. Additional SBA regulations give these general requirements more specific content.

A firm has the potential for success if it has been "in business in its primary industry classification for at least two full years immediately prior to the date of its . . . application." Id. § 124.107.[1] To satisfy this two-years-in-business rule, the applicant must provide tax returns for the two previous years "show[ing] operating revenues" in the industry to which it is applying. Id. § 124.107(a). But the SBA's assessment does not end there. The SBA will consider additional factors—such as the applicant's record of performance on previous contracts in the industry where it is applying—when assessing potential for success. See id. § 124.107(c), (d). An applicant that fails to satisfy the two-years-in-business rule may nonetheless be admitted to the program if the SBA, in its discretion, decides to grant the firm a waiver. To be eligible for a waiver, the applicant must be owned by a disadvantaged individual with "substantial business management experience" and have a "record of successful performance" on contracts in the industry where it is applying, among other requirements. See id. § 124.107(b)(1).

Regulations also elaborate on the program's ownership requirements. An individual is prohibited from qualifying her firm for the program if she "has an immediate family member who is using or has used his . . . disadvantaged status to qualify another [firm]." Id. § 124.105(g)(1). The SBA may also waive this prohibition, but only if "the two [firms] have no connections, either in the form of ownership, control[,] or contractual relationships," and if "the individual seeking to qualify the second [firm] has management and technical experience in the industry." Id. And the SBA will apply a presumption against waiver "[w]here the [firm] seeking a waiver is in the same or a similar line of business as the current or former [program participant]." Id.

The program's eligibility and waiver provisions largely depend upon a determination of the applicant firm's primary industry classification. Applicants are classified according to the

---

[1] As explained infra at 2–3, determining a firm's primary industry classification is an important part of the SBA 8(a) program structure.

North American Industry Classification System using the six-digit NAICS "code designation which best describes the [applicant's] primary business activity."[2] Id. § 124.3. The record in this case reflects the SBA's attempt to answer two questions: Which primary industry classification best describes Ardmore's primary business activity? And how does the answer to that question affect Ardmore's eligibility for the program?

Ardmore's initial application offered deeply contradictory evidence about its proper industry classification. Its "Business Profile" supplied the NAICS code associated with Data Processing, Hosting, and Related Services.[3] See Joint Appendix Part I [ECF No. 19] ("J.A. I") at 72. Its tax returns—or at least some of them—supplied the code for All Other Professional, Scientific, and Technical Services ("All Other Professional Services").[4] Joint Appendix Part II [ECF No. 19-1] ("J.A. II") at 80–81. Ardmore also submitted a list providing information about its two recent contracts. Each contract was labeled with a new code—one was labelled with the code for Industrial Design Services; the other was labelled with that for Other Computer Related Services. Id. at 8. But in a separate column of the list, Ardmore described the work performed under those contracts as "Engineering Software Development and Implementation" and "Custom Software Development." Id. And the corresponding invoices described Ardmore's work as "IT Consulting Services." See id. at 10–21, 23, 25–29, 31–38. These descriptions match other NAICS codes.

---

[2] The ownership requirements employ a closely related concept: the line of business. See id. § 124.105(g)(1). Two firms are in the "[s]ame or [a] similar line of business" when their business activities fall "within the same four-digit 'Industry Group' of the NAICS Manual." Id. § 124.3. A firm's line of business can therefore be derived by taking the first four digits of its primary industry classification code.

[3] In the record, primary industry classifications are most often identified by six-digit NAICS code rather than by title. The NAICS manual can be used to match one to the other, as the Court has done in this opinion. See 2012 North American Industry Classification System, available at http://www.census.gov/eos/www/naics/.

[4] Ardmore submitted two sets of tax returns with its application. The first set—personal tax forms filed on behalf of Ms. Prabhu and reporting "Profit or Loss From Business"—were labelled with 561490. See J.A. II at 76–78. According to the SBA, that is an "unidentified NAICS code." J.A. I at 4. The second set—corporate tax forms filed on behalf of Ardmore—included the code for All Other Professional Services. See J.A. II at 80–81.

The SBA contacted Ardmore by letter less than two weeks after receiving its initial application. The letter detailed the inconsistencies in the record regarding Ardmore's primary industry classification—also noting that an online database for government contractors listed Ardmore's classification as Janitorial Services—and asked Ardmore to clarify. See J.A. I at 65. The letter also communicated some initial doubt about Ardmore's 8(a) eligibility. Based on the evidence Ardmore had offered to that point, the SBA expressed that Ardmore might operate in a similar line of business as SRM Group, a former 8(a) program participant owned by Ms. Prabhu's husband. See id.

Ms. Prabhu responded in an attempt to clear up the confusion. She claimed that Ardmore's primary classification was Industrial Design Services and attributed the contradictory evidence in the record to errors of various kinds—the inclusion of the code for All Other Professional Services had resulted from an "oversight" made while filling out Ardmore's taxes; inclusion of the code for Janitorial Services arose from technical problems with the government's "obsolete" database. See id. at 70. She also sought to differentiate her husband's firm from Ardmore: "SRM Group primarily works in Janitorial Services and Administrative / Management Support while Ardmore Consulting is in Engineering Software Development. These areas are NOT EVEN CLOSE to each other." Id. at 69.

After a review of Ardmore's application and Ms. Prabhu's response, the SBA concluded that the firm was ineligible for a number of reasons. First, Ms. Prabhu could not use her disadvantaged status to qualify Ardmore for the program because her husband had already used his to qualify SRM Group. See id. at 54; see also 13 C.F.R. § 124.105(g)(1). Ardmore was also barred by the two-years-in-business rule because it had not provided tax returns showing two years

4

of revenue in the primary industry in which it was applying.[5] See J.A. I at 54–55; see also 13 C.F.R. § 124.107(a). Nor, in the SBA's view, was Ardmore eligible for the relevant waivers. The SBA refused to waive the ownership requirement because it found that Ardmore and SRM Group operated in the same or similar lines of business and, additionally, because the two firms retained significant connections to one another. See J.A. I at 54. And it refused to waive the two-years-in-business rule because it found that Ms. Prabhu lacked substantial business experience, and because Ardmore had failed to establish a record of successful performance on contracts in Industrial Design Services, the industry in which it was applying. See id. at 55. Underlying these conclusions was the SBA's determination that Ardmore's primary business activity, as described in the invoices it had submitted, was properly classified within the "IT/consulting field." See id. at 54.

Ardmore promptly requested reconsideration in a letter that challenged several of the SBA's conclusions—especially those regarding Ms. Prabhu's business experience and Ardmore's connections to SRM Group. See id. at 14–16. The request also revisited the issue of Ardmore's proper primary industry classification. Now, the letter asserted, Ardmore was applying to All Other Professional Services, id. at 15—the industry reflected by Ardmore's most recent corporate tax forms (but previously attributed to an oversight), see id. at 70. Moreover, Ardmore criticized the SBA's reliance on its invoices when classifying its business activity. According to Ms. Prabhu's letter, "the use of IT Consulting Services on [Ardmore's] client invoices was not an indication of the scope of the work that [Ardmore] performed"; it was merely a "short-hand notation." Id. at 16. And even if the SBA elected to treat "IT Consulting Services" as a description of services actually provided, it was a "logical leap" to associate those services with SRM Group's

---

[5] Compare J.A. II at 80–81 (corporate tax returns indicating a primary industry of All Other Professional Services) with J.A. I at 70 (identifying Industrial Design Services as the industry in which Ardmore was applying).

5

primary industry (now identified as Custom Computer Programming Services rather than Janitorial Services, as previously indicated). See id. at 15.

The SBA reconsidered Ardmore's application in its newly chosen industry, but arrived at the same answer: Ardmore remained ineligible for admission into the 8(a) program. The SBA's decision was based largely on its determination that Ardmore's work was best described as Custom Computer Programming Services—not All Other Professional Services. And that determination was based, in turn, on Ardmore's descriptions of contracts to provide its clients with "Custom Software Development."[6] See id. at 5. The issue of Ardmore's proper industry classification finally resolved, the SBA turned to Ardmore's eligibility. It concluded that Ardmore did not meet the ownership requirements, for the same reasons set forth in its initial denial: Ardmore and SRM Group operated in the same line of business and retained connections to one another that precluded a waiver. See id. Ardmore similarly remained in violation of the two-years-in-business rule. Even though the code on its tax returns now matched that on its application, Ardmore had "not provided any contracts [indicating it had] performed work" properly classified as All Other Professional Services. Id. Because of that failure, Ardmore could not demonstrate two years of experience in its chosen industry, nor could it obtain a waiver based on its record of successful performance in that industry. See id. at 5; see also 13 C.F.R. § 124.107(b)(iv).

Ardmore has now challenged the SBA's decision under the Administrative Procedure Act, arguing that it is arbitrary, capricious, and otherwise contrary to law.[7] It takes issue with three of

---

[6] In the list it submitted for reconsideration, Ardmore classified these contracts as falling within All Other Professional Services. See id. at 21. But the contract list had been labelled with different codes in Ardmore's initial application. At that point, Ardmore had been seeking admission in the Industrial Design Services industry classification. See id. at 70. And in support of that application, one of its contracts had been labelled with the corresponding code. See J.A. II at 8 (assigning the NAICS code 541420 to Ardmore's contract with Construction Systems Associates).

[7] The Administrative Procedure Act allows aggrieved parties to challenge "final" agency actions. 5 U.S.C. § 704. The parties here agree that the SBA's denial of Ardmore's application is "final" under SBA regulations because it rested in part on an assessment of Ardmore's potential for success. See 13 C.F.R. § 124.206(a) ("An applicant may

6

the SBA's conclusions in particular: that Ardmore (1) operates in the same line of business as SRM Group; (2) retains connections to SRM Group; and (3) had not been in business in its primary industry classification for two years at the time of its application. See Compl. [ECF No. 1] at 17–20. The parties' cross-motions for summary judgment are now before the Court.

## **LEGAL STANDARD**

Ordinarily, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). But when, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply. See Roberts v. United States, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012). Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Kaiser Found. Hosps. v. Sebelius, 828 F. Supp. 2d 193, 198 (D.D.C. 2011) (internal quotation marks and citations omitted). This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard requires the agency to "examine the relevant [evidence]" and "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (internal quotation marks omitted). But this

---

appeal the denial of a program admission to SBA's Office of Hearings and Appeals . . . , if it is based solely on a negative finding of social disadvantage, economic disadvantage, ownership, control, or any combination of these four criteria. A denial decision that is based at least in part on the failure to meet any other eligibility criterion is not appealable and is the final decision of SBA." (emphasis added)).

7

explanation need not be "a model of analytic precision to survive a challenge." Coburn v. McHugh, 679 F.3d 924, 934 (D.C. Cir. 2012) (internal quotation marks omitted). Indeed, courts "<u>must</u> uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 248 (D.C. Cir. 2008) (emphasis added) (internal quotation marks omitted).

In this case, Ardmore seeks to overturn several of the SBA's factual findings. Agency fact-finding must be supported by substantial evidence to pass muster under the APA, which holds true even when, as here, findings are reached through a process of "informal adjudication." See Safe Extensions, Inc. v. FAA, 509 F.3d 593, 604 (D.C. Cir. 2007). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). Importantly, "an agency decision may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." Morall v. Drug Enforcement Admin., 412 F.3d 165, 176 (D.C. Cir. 2005) (internal quotation marks omitted). An agency's factual findings should be set aside, then, "only when the record is so compelling that no reasonable factfinder" could have reached the agency's conclusion, Orion Reserves Ltd. P'ship v. Salazar, 553 F.3d 697, 704 (D.C. Cir. 2009) (internal quotation marks omitted), or when the agency has "ignore[d] evidence contradicting its position," Butte Cnty., Cal. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010).

## **DISCUSSION**

Most of the conclusions Ardmore challenges are rooted in one key factual finding: that Custom Computer Programming Services is the industry classification that "best describes" Ardmore's "primary business activity." 13 C.F.R. § 124.3. As the SBA's final decision notes, Ardmore "provided inconsistent information" regarding its proper industry classification, see J.A.

I at 4; in fact, it claimed "at least three different primary [industries]" "throughout the application process."[8] Id. at 5. But the SBA nonetheless was charged with the unenviable task of "resolv[ing] factual issues to arrive at a decision that is supported by the administrative record." Fuller v. Winter, 538 F. Supp. 2d 179, 185 (D.D.C. 2008). In so doing, it relied on Ardmore's list of recent contracts—specifically, on the column in which Ardmore had described its work. Ultimately the SBA decided these "description[s]" of contracts to provide "Custom Software Development" put Ardmore within the Custom Computer Programming Services industry, see J.A. I at 5, which properly "comprises establishments primarily engaged in writing, modifying, testing, and supporting software to meet the needs of a particular customer," 2012 North American Industry Classification System (Sector 54, Code 541511).

Surely a "reasonable factfinder" could have reached this conclusion. See Orion Reserves, 553 F.3d at 704. The fit between Ardmore's description and the SBA's chosen classification is apparent. Ardmore not only develops software—a process that must include either "writing, modifying, testing, [or] supporting" it—but also "custom[izes]" it—or adjusts it "to meet the needs of a particular customer."[9] Perhaps a different factfinder could have reached a different conclusion, focusing on different evidence—indeed, the deeply contradictory record may have

---

[8] Ardmore insists that the number of industry classifications it has claimed throughout the application process is "simply irrelevant" to its eligibility and therefore "cannot serve as a basis for declining [its] . . . application." Pl.'s Opp'n & Cross-Mot. for Summ. J. [ECF No. 11-1] at 12–13. But the SBA did not simply reject Ardmore's application because it had provided inconsistent industry classifications throughout the process. Instead, it reached a decision about Ardmore's proper industry classification, then assessed the consequences of that finding for Ardmore's eligibility. See J.A. I at 4–5. Nor does the Court agree that the confusion Ardmore created regarding its classification was "irrelevant." The SBA was required to consider the contradictory evidence in the record. See Butte Cnty., 613 F.3d at 194. The Court, therefore, does not fault the SBA for calling attention to that contradictory evidence in its decision—nor for tracing the confusion back to Ardmore.

[9] Ardmore argues that the Court should reject the fit between the SBA's chosen classification and Ardmore's descriptions as a "post-hoc rationalization[]" for the SBA's decision. Pl.'s Reply [ECF No. 16] at 3. In Ardmore's view, because the SBA's decisions "do[] not contain . . . analysis" of the industry descriptions, the decisions are not in fact based upon them. Id. The Court disagrees. The SBA's decision clearly states that "the work [Ardmore] performed . . . is Custom Software Development which should be properly classified as [Custom Computer Programming Services]." J.A. I at 5. This statement admits of only one fair reading—that the SBA's decision was based on the fit between Ardmore's work and the NAICS description of that industry.

been able to bear any number of "plausible . . . interpretation[s]."[10]  Morall, 412 F.3d at 176 (internal quotation marks omitted).  But that does not mean the SBA's conclusion was arbitrary.  See id.  Because it was supported by evidence that "a reasonable mind might accept as adequate to support a conclusion," it must be upheld.  Richardson, 402 U.S. at 401 (internal quotation marks omitted).

Ardmore advances several arguments aimed at undermining this conclusion.  Ardmore's overarching argument is that the SBA cherry-picked evidence to support its conclusion, while ignoring evidence that undercut it.  That allegedly ignored evidence includes: (1) Ardmore's (corporate) tax returns, which are labelled with the code corresponding to All Other Professional Services; (2) invoices to, and letters from, clients Network Professional Group and Construction Systems Associates; and (3) Ms. Prabhu's explanation (offered in her request for reconsideration) that the description "IT Consulting Services" appearing on Ardmore's invoices was simply a "short-hand notation for the services provided," rather than a robust description of them.  See Pl.'s Opp'n & Cross-Mot. for Summ. J. at 12.

The Court is not persuaded.  In the first place, the SBA claims to have reached its final decision "[a]fter a careful review of the material that [Ardmore] submitted," J.A. I at 4, and there is little reason for the Court to doubt it.  Indeed, the record here demonstrates that, throughout its consideration (and reconsideration) of Ardmore's application, the SBA grappled seriously with the conflicting evidence about Ardmore's primary industry classification.  That effort began less than two weeks after Ardmore had submitted its initial application, when the SBA reached out to

---

[10] It is far from clear, however, that a reasonable factfinder could place Ardmore within its desired industry, All Other Professional Services.  That industry properly includes establishments "primarily engaged in the provision of professional, scientific, or technical services" other than "computer systems design and related services; management, scientific, and technical consulting services"; or other enumerated services.  2012 North American Industry Classification System (Sector 54, Code 541990).  Thus, even assuming that Ardmore's proper industry classification was not Custom Computer Programming Services, Ardmore likely would fit in another computer-related or technical industry—not in the catch-all category where it applied.

Ardmore in search of clarity on the issue, see id. at 65, and it continued through the SBA's final denial, see id. at 4–5. Along the way, the SBA even cited several of the specific sources that Ardmore now accuses it of ignoring. See id. at 65 (noting in its request for clarification that Ardmore's "most recent corporate tax return identifies . . . All [O]ther Support Services" as its primary industry classification); id. at 54 (relying on "copies of [Ardmore's] invoices" reflecting work in "the IT/consulting field" in its initial denial); see also id. at 4 (citing in its final decision Ms. Prabhu's personal "tax returns" relating to profit or loss from a business). Ardmore bears the burden of showing that the SBA ignored any evidence contrary to its conclusion. See Banner Health v. Sebelius, 715 F. Supp. 2d 142, 153 (D.D.C. 2010). It has failed to meet that burden here.

It is true that the SBA did not explicitly articulate why it relied on the descriptions in Ardmore's contract list instead of the other evidence in the record. But this does not render its final decision "devoid of reasoned analysis" and "arbitrary," as Ardmore now argues. Pl.'s Reply at 2. Ardmore has cited no authority requiring an agency to specifically explain its view on each source of evidence in the record. The proper inquiry for the Court is whether the SBA's path to its conclusion "may reasonably be discerned." State Farm, 463 U.S. at 43 (internal quotation marks omitted). The answer is plainly yes. Against the backdrop of the "inconsistent information" Ardmore had provided "throughout the application process" regarding its proper industry classification, the SBA refused to simply accept the evidence "as [Ardmore had] labeled it." J.A. I at 4–5. Instead, the SBA focused on resolving the inconsistencies by making its own assessment of the "description[s]" Ardmore had provided. Id. at 5.

The contract descriptions have clear value in making such an independent assessment. First, and most obviously, they provide the record's most robust "description" of Ardmore's work. And they are valuable in another respect as well: they were never repudiated by Ms. Prabhu.

11

Rather, the contract list descriptions remained constant throughout the application process. Compare J.A. I at 21 (list submitted on reconsideration describing contracts to provide "Custom Engineering Software Development and Implementation" and "Custom Software Development" to clients Construction Systems Associates and Network Professionals Group), with J.A. II at 8 (list submitted with initial application describing contracts to provide "Engineering Software Development and Implementation" and "Custom Software Development" to those same clients). At no point during the application process did Ardmore claim these descriptions were inaccurate.

The same cannot be said of the other key descriptive source in the record: Ardmore's invoices, which reflect work in the fields of IT and Consulting. The SBA relied on these invoices in its initial denial when assessing Ardmore's proper line of business. See J.A. I at 54. But Ms. Prabhu responded in her request for reconsideration by undermining the invoices' evidentiary value. She asserted that "[i]n truth, all or most of these invoices . . . indicate that the description of services provided was 'IT/Consulting Services', a short-hand for the actual engineering and other technical services provided." Id. at 15. The Court is therefore unsurprised that the SBA decided not to rely explicitly on this "short-hand" in its final decision.[11]

Other sources of evidence in the record are neither descriptive nor consistent. By the time of reconsideration, Ardmore's tax returns and contract list were labelled with the code corresponding to its preferred primary industry classification, All Other Professional Services. See id. at 16, 21. But when responding to the SBA's initial request for clarification, Ms. Prabhu had attributed the inclusion of that code in Ardmore's application to an "oversight." Id. at 70. Why

---

[11] In any event, the SBA's decision appears entirely consistent with the descriptions in Ardmore's invoices. The Computer Systems Design and Related Services industry cluster (which includes the Custom Computer Programming Services industry) "comprises establishments primarily engaged in providing expertise in the field of information technologies." 2012 North American Industry Classification System (Sector 54, Code 54151). That description is an adequate match for "IT/Consulting Services"; indeed, the two are almost synonymous.

should the Court now require the SBA to look past that statement and rely on a mere "label[]" that does nothing to describe the work that Ardmore actually performed?  Ardmore does not have a persuasive answer.

After this last of Ardmore's arguments is set to the side, what remains is essentially a request for the Court to "substitute its judgment for that of the [SBA]" and draw its own conclusion about Ardmore's primary industry classification.  State Farm, 463 U.S. at 43.  But this, of course, the Court will not do.  The SBA's findings regarding Ardmore's primary industry classification are reasonable, supported by substantial evidence, based on consideration of the entire record, and adequately articulated.  They therefore must be upheld.

Those findings are sufficient to support another SBA conclusion as well—that Ardmore failed to demonstrate its "potential for success" in the All Other Professional Services industry classification.  The operative regulations require the SBA to examine Ardmore's "record of performance on previous . . . contracts in the primary industry <u>in which [it was] seeking . . . certification</u>" when "assessing [its] potential for success."  13 C.F.R. § 124.107(d) (emphasis added).  In this case, the SBA undertook that analysis and, as explained above, reached a reasonable conclusion supported by substantial evidence—namely, that Ardmore's work had not been performed in that industry at all.  From there, the SBA's conclusion logically follows: Ardmore could not adequately demonstrate its potential for success in the industry to which it was applying.  The Court sees no reason to disturb that conclusion.[12]

---

[12] There is one—ultimately resolvable—tension in the SBA's decision.  Why, after deciding that Ardmore belonged in the Custom Computing Programming Services industry, did the SBA evaluate its potential for success in All Other Professional Services?  The SBA has a simple answer: the regulations "required [it] to evaluate" Ardmore in "the industry in which [Ardmore was] seeking 8(a) . . . program certification." J.A. I at 55.  That is indeed one permissible interpretation of the potential-for-success regulations—and Ardmore does not argue otherwise.  The Court observes that rigid application of this rule has the potential to cause hardship in a specific case where, for example, an applicant that can clearly demonstrate its eligibility under one classification mistakenly includes another on its application, and is therefore denied.  But this is not that case.  As discussed above, Ardmore was given multiple

That is sufficient to decide this case. Ardmore needed to demonstrate its potential for success in order to be eligible for the 8(a) program. See 13 C.F.R. § 124.101. Because it has failed to do so, its alleged connections with SRM Group have no bearing on its ultimate eligibility. The Court will therefore refrain from addressing that issue. See United States v. Craig, 861 F.2d 818, 821 (5th Cir. 1988) ("This is simply another application of the sound judicial practice of refusing to decide or address issues whose resolution is not necessary to dispose of a case. . . .").

## CONCLUSION

For the foregoing reasons, the Court will grant the SBA's motion for summary judgment and deny Ardmore's cross-motion.

A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: August 7, 2015

---

chances to clarify and amend its application. Ultimately, the SBA considered the application under Ardmore's expressly "chosen [classification] . . . All Other Professional, Scientific and Technical Services." Id. at 16.